*Henry Holmes* for the plaintiffs.

*Lorrin Andrews* for the defendant.

---

## JOHN D. PARIS *v.* JOHN GREIG, Temporary Administrator of the Estate of ANTONIO FERNANDES, deceased.

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

SUBMITTED OCTOBER 3, 1899.        DECIDED DECEMBER 19, 1899.

FREAR AND WHITING, JJ., AND A. A. WILDER, ESQ., OF THE BAR, IN PLACE OF JUDD, C.J., DISQUALIFIED.

Specific performance may be decreed of a contract to sell and assign a ranch though it consists of only leasehold interests and other personal property.

Although specific performance may be decreed of a part only of a contract which is by its terms divisible, or, under some circumstances, of so much of a contract as can be performed with an abatement of the price as to the part that cannot be performed, yet, under the circumstances of the present case, where specific performance cannot be decreed of the portion of the contract which provides for the sale of the cattle and horses on the ranch, it should not be decreed of the portion that provides for the sale of the leases, although these are provided for in a separate clause and at a separate price.

The cattle were to be paid for at $10 a head, the number to be ascertained by a drive by the vendor and a count by both parties. The cattle were, many of them, wild and roamed over an extensive country covered largely by forests and lantana. It would require from three to six months to make a complete drive. It was provided that the drive should be made by the vendor partly because

of his special knowledge of the cattle and the country and his interest in having the drive as complete as possible. The rule that equity will not undertake to enforce specific performance of acts which require the exercise of peculiar skill or knowledge or which extend over a long period and require continuous supervision would have little or no application in this case, if the vendor were living, because his own interests would compel him to make as complete a drive as possible and it would be immaterial to the vendee whether the drive were complete or not, as he would get all the cattle there were on the ranch but would have to pay for only those that were driven. No time having been agreed upon within which the drive should be made, the court could fix a reasonable time.

The rule that equity will not compel a party to complete a contract, as by naming a price or appointing a valuer, where such a method is prescribed in the contract for the determination of the price, perhaps would not apply to the case of a sale of cattle at a certain price per head, the number to be determined by a drive by the vendor,—if the vendor were still alive.

But in view of the nature of the drive and the provision of the contract that it was to be by the vendor, without naming his administrator, it is held that in the present case the intention was that the making of the drive should be the personal privilege or act of the vendor and that equity could not properly compel his administrator to complete the contract by making the drive himself.

OPINION OF THE COURT BY FREAR, J.

This is a bill in equity to compel the specific performance of the following agreement:

This agreement made and entered into this 14th day of October, A. D. 1898, witnesseth that I, Antonio Fernandes of Kaumalumalu, N. Kona, agree to sell all my cattle to J. D. Paris at the rate of $10.00 (Ten Dollars) per head for all cattle over one month old and all calves under one month old to be thrown in with the herd without charge, said cattle to be driven by me and counted by said J. D. Paris and Antonio Fernandes or their authorized agents, all said cattle to be strong and healthy.

And I also agree to sell all my horses to said J. D. Paris at the rate of $30.00 per head, to be counted by said J. D. Paris and myself.

2d.  I agree to sell all my leases of Kaumalumalu and Holua-

loa and also a ⅓ interest in a lease on Kaumalumalu held by my cousin M. G. Sant Anna for $500.00 (Five Hundred Dollars).

I also agree that one-half of the amounts to be paid for said cattle and horses and leaseholds to be paid cash and one-half in four years' time in notes to be given by said J. D. Paris at the rate of five per cent. interest per annum.

And I, J. D. Paris, agree with said Antonio Fernandes upon the delivery of said cattle aforesaid, I will pay for the same at the rates viz., $10.00 per head for all cattle over one month old and for all horses at the rate of $30.00 per head.

And said Fernandes also agrees that all dairy utensils and saddles of all descriptions and all pigs and poultry shall be thrown in free of charge with the ranch.

And I, J. D. Paris, agree to give my note for the amounts and at the rate of interest above stated.

In witness whereof we have hereto set our hands and seals this 14th day of Oct., 1898.

<div style="margin-left:3em">

(Sig.)     ANTONIO FERNANDES.

(Sig.)      . J. D. PARIS.

</div>

The controversy relates to the provision, in the first part of the agreement, for the driving of the cattle. Fernandes drove from October 20 to November 12, and he and Paris counted 964 cattle. These cattle were turned out and no more driving was done. Fernandes and Paris then talked the matter over. Afterwards Fernandes claimed that Paris at that time conceded that there were 1400 head altogether on the ranch and agreed to pay for that number without further driving. Paris claimed that he did not so agree but that he conceded that there were 100 head undriven and that he would pay for that number in addition to the number driven, or would pay for 1400 if Fernandes would guarantee that number, which Fernandes refused to do. Fernandes refused to make another drive. The Circuit Judge found that Paris did not agree to accept 1400 as the number Fernandes had or to pay for that number; also that the drive was not complete and that Fernandes had a large number, between 100 and 500 head, that were not driven; that it would require from three

to six months to make a complete drive, owing to the extent of the country over which the cattle roamed, and especially its peculiar features, it being largely covered with forests and lantana, and owing also to the wildness of the cattle; and that both parties were to some extent to blame for not completing the drive, the cattle having been turned out as fast as driven and counted, in the belief or hope of both parties that the drive would result in but a small difference between the number found and the number claimed by Fernandes to be on the land and that the number undriven to be allowed and paid for could be agreed upon. These findings are not seriously questioned on these appeals. The ques-·tion then arose whether a new drive should be ordered and the contract be enforced. The Circuit Judge held that it could not order a new drive and hence could not enforce the entire contract, but decreed specific performance of that portion of the contract which provides for the assignment of the leases, with liberty to Fernandes to perform the whole contract, and from this decree both parties appealed.

In this court the death of Fernandes was suggested and a motion was made to substitute the temporary administrator, John Greig, as respondent. This motion was granted subject to the further consideration of the court as to whether it was proper to substitute a temporary administrator as respondent in a suit of this kind. Since then the regular administrator has been appointed and has entered his appearance and consent to be bound by all the proceedings in this case. For this reason as well as for the reason that we find for the defendant on other grounds we need not consider this question further.

In our opinion this is a proper case for specific performance, so far as the subject of the contract is concerned, although that consists of only leasehold interests and other personal property.

We are also of the opinion that the Circuit Judge erred in decreeing specific performance of a part only of the contract. It is true specific performance of a part only of a contract may be decreed where by its terms its different parts are severable (see *Wilkinson v. Clements,* L. R. 8 Ch. App. 96) and in some

cases it may be decreed *pro tanto* with an abatement of the purchase price even where the contract is not by its terms severable if the part that cannot be enforced is of little consequence as compared with the remainder. See *Richardson v. Smith*, L. R. 5 Ch. App. 648. But such is not the present case. Here the sale of the cattle constituted the main feature of the contract, the assignment of the leases being of minor importance, except in connection with the cattle, and the contract was evidently intended to be entire, although the different portions of the property to which it relates were dealt with separately. It was a contract for the sale of a ranch and the parties could not have contemplated a sale of the leaseholds for $500, with no provision for either the sale or the removal of the cattle. Apparently it would take months to remove the cattle and what disposition could be made of them as fast as they could be removed does not appear. Specific performance of the agreement to assign the leases could not justly be decreed under the circumstances merely as a penalty or whip to compel the respondent to perform the whole contract rather than to be left with his herd of cattle to starve on his hands.

But can the entire contract be specifically enforced? It is clear that it cannot until the cattle have been driven and counted, for until then it would be incomplete. Until then, one essential element of the contract, the price to be paid, would remain unascertained. This is therefore in effect a suit first to compel the completion of a contract to sell, by enforcing a contract, if any, to drive, and, secondly, to enforce the contract to sell, when that is completed. The original bill contained no allegation in regard to a drive except in so far as it included a copy of the agreement and contained no prayer for a drive except in so far as it prayed generally for the specific enforcement of the agreement. The amended bill sets forth the drive that was made, offers to pay for 100 head in addition to those counted, or for the whole 1400 claimed if the defendant will guarantee that number, and prays generally, as in the original bill, for the specific enforcement of the agreement. It seems now to be taken for granted that if the contract is to be specifically enforced a new drive will be neces-

sary. Let us assume that the allegations and prayers of the bill would be sufficient to justify an order for a new drive, if the facts would otherwise warrant such relief. Could then the court properly order a drive, by the original defendant if still living, or now by his administrator or by a master?

As a rule courts of equity do not attempt, because of the impracticability of doing so, to enforce the performance of acts which require the exercise of personal skill, taste or judgment or which extend over a long period of time and require continuous supervision. This rule, in our opinion, although presented to some extent in argument, would have little or no application to the present case if the original defendant were still alive. The parties having fixed no time within which the drive should be made, the court might fix a reasonable time (see *Smith v. Peters*, L. R. 20 Eq. 511), and the drive would require little or no supervision by the court, and it would matter little except to the defendant himself whether he employed his peculiar skill or judgment or knowledge to the best advantage. His own interests would in all probability compel him to make a complete drive and, if it did not, the plaintiff would not suffer, for he would get all the cattle on the ranch but would be obliged to pay for only those that were driven and were not under one month old and were strong and healthy. The question whether the drive contemplated by the parties is one requiring the exercise of peculiar skill or judgment or perhaps rather the possession of peculiar knowledge of the cattle and the lands over which they roamed, is of importance, not so much with reference to the general power or practice of courts of equity, as with reference to the construction of the agreement in question. Did the parties contemplate a drive by Fernandes personally? Was a drive by him of the essence of the contract, or was this a mere unessential mode of carrying out the contract?

Contracts for a sale at a price to be determined have frequently come before the courts. If the contract is for a "fair" or "reasonable" price, such price may be ascertained in any appropriate way, as by a master, for the parties have not specified any particu-

lar way in which it should be determined. Indeed, in such a case, the contract can hardly be said to be incomplete, for, the parties having themselves already agreed that the sale should be for a fair or a reasonable price and such price being capable of ascertainment, it is regarded as fixed, on the principle that that is certain which can be made certain. *Van Doren v. Robinson*, 16 N. J. Eq. 256, 260. But where the parties have specified the mode in which the price shall be ascertained, no other mode can, as a rule, be enforced, for the court cannot make a contract for the parties different from that which they have made for themselves. And yet even in such cases the method of valuation may sometimes be considered not of the essence of the contract, so that if the valuation cannot be made *modo et forma* the court may pursue some other method, as where under the terms of the contract the vendor has enjoyed the substantial benefits of the contract and the valuation is a matter of detail to be settled in carrying out a minor provision of the contract. Such a case is different from one in which the substantial rights are not changed by the failure of the method prescribed by the contract, where the property and the money remain where they were previously. *Dinham v. Bradford*, L. R. 5 Ch. App. 519, 523. But where the valuation is in the nature of a condition precedent to the completion of the contract or the vesting of substantial rights thereunder, the mode of valuation agreed upon by the parties is, in the absence of any indication to the contrary, deemed to be of the essence of the contract.

The most common method of valuation agreed upon is that by two persons one chosen by each party or by an umpire to be appointed by those two in case of their disagreement. In such cases if one of the parties refuses to appoint a valuer, the court will neither compel him to do so nor ascertain the value itself through a master or otherwise, even though it is especially prayed to do so. *Agar v. Macklew*, 2 Sim. & Stu. 419; *Milner v. Gery*, 14 Ves. 400. It is plain in such a case that the court ought not to substitute a master for the valuers, for that would be to make a contract for the parties. Just why the court could not compel the party to appoint a valuer in accordance with the terms of the

contract is not altogether agreed. It is sometimes said that that would be equivalent to enforcing an agreement to refer to arbitration, which equity always declines to do, among other reasons, because it is against public policy to permit agreements to oust the courts of jurisdiction. But that reason applies only to cases in which there is an existing cause of action independently of the agreement to refer and has no application to cases like the present where there can be no cause of action until the valuers have acted, that is, until the contract has been completed by the ascertainment of the price. *Scott v. Avery,* 5 H. L. Cas. 811, 823. Perhaps the true reason lies in the impracticability of enforcing a contract to complete a contract especially where that can be done only through the intervention of third parties over whom the court has no control. See *The Domestic Tel. Co. v. The Metropolitan Tel. Co.,* 39 N. J. Eq. 160, 167; 40 N. J. Eq. 287, 303, 304. In some cases the sale is at a price to be agreed upon by the parties. It is obvious that in such cases the court could not compel the parties to agree.

But here the party himself alone was to do that which was to make it possible to ascertain the sum to be paid (not to mention the matter of the count, in regard to which no question has been raised), and it is a question how far equity could properly interpose to prevent him from taking advantage of his own wrong in not making the drive. It has been held that, in the case of a sale at a valuation to be made by a party named in the contract, equity would decree specific performance if the valuer were willing to make a valuation and would even go so far as to enjoin the defendant from preventing the valuer from making the valuation. *Smith v. Peters, supra.* But where the valuation was to be made by valuers to be named, one by each party, the court declined to interfere even though the defendant had appointed a valuer but had afterwards altered his mind and would not allow the valuer to proceed. *Vickers v. Vickers,* L. R. 4 Eq. 529. And in *Richardson v. Smith, supra,* the court, overruling the Vice-Chancellor, declined to interpose in regard to the portion of a contract which provided for a price to be determined by valuers to be agreed upon, where the defendant

had nominated valuers but had afterwards withdrawn the nomination. In *The Domes. Tel. Co. v. The Metr. Tel. Co., supra,* as in the present case, the defendant alone was to act. He alone was to fix the price. Seven of the judges held that equity could not properly compel him to name a price, but the remaining five judges dissented and held that he ought to be compelled to do so even though he might name a price so high as to render acceptance impossible. In the present case there could not be this difficulty, for the defendant could not drive more cattle than there were and the price per head was already fixed. Perhaps, on the whole, but we do not so decide, if the original defendant were living, he might properly be compelled to make the drive, though it must be confessed that this is not altogether clear from the authorities. We have discussed this phase of the case at such length because of the light it throws upon the further question, whether the administrator may be compelled to make the drive. It tends to show how courts of equity regard cases of this kind, how reluctant they are to depart from the terms agreed upon by the parties, and that except under unusual circumstances they regard the manner agreed upon by the parties for the determination of the sum to be paid, as of the essence of the contract. In the present case it is clear that the court could not substitute a master for the party named in the contract to make the drive, and we believe that we could not consistently with the terms of the contract compel the administrator to make the drive.

The contract expressly provided that the drive should be made by Fernandes. In the same clause it is provided that the count should be made by the parties *or their authorized agents.* The drive was to be made by Fernandes, not by Fernandes *or his authorized agent,* thus tending to show that the parties regarded this as a personal privilege or act on his part, not indeed, that he was bound to make the drive personally but that it was his privilege to supervise it. This provision was inserted, not for Paris' benefit alone, in order that the labor and expense of the drive might not be borne by him, but more especially for the benefit of Fernandes, in order that the number of cattle to be paid for might be as large as possible, owing to his familiarity with the

cattle and the country over which they roamed and his interest in having the drive as complete as possible. The parties evidently contracted on the assumption that Fernandes was to live long enough to make the drive. Fernandes contemplated a drive by himself alone. The provision that the drive should be made by him was not a mere matter of form or intended merely to settle who should perform the labor and bear the expense. It was inserted with reference to its effect upon the total sum to be paid for the cattle. An administrator is generally bound to perform the contracts of his decedent relating to personal property even though not expressly named, except where the acts to be performed are intended to be personal as shown either from their nature or by the intention of the parties manifested by the entire contract and the surrounding circumstances, and even in such cases the administrator is often liable in damages for breaches made before the death of the party, though not for breaches occurring thereafter. Under all the circumstances of the present case we believe that it was of the substance of the contract that Fernandes should have the privilege of making the drive himself personally. In *Agar v. Macklew, supra,* the court, though it dismissed the bill on the ground that it could not compel the appointment of a valuer or substitute a master for the valuer, held that the appointment of the valuer might be made by executors, administrators or assigns, but it held so for the reason that these were expressly named. In *Morgan v. Milman,* 3 DeG. M. & G. 24, the sum to be paid was to be settled by arbitration or a jury as one of the parties should choose. This party died before making the choice. The court apparently thought that his executor could not make the choice, although it no doubt would not have compelled the original party to do so, had he been alive. In *Blundell v. Brettargh,* 17 Ves. 232, the value of certain lands was to be fixed within a certain time by two arbitrators named in the contract. They made an award within the time prescribed but not until four days after the death of one of the parties. The words "heirs, executors, administrators and assigns" occurred almost uniformly throughout the contract in connection with the names of both parties, but in the passage by which

the parties bound themselves, they were described as "parties to these presents," and the award was to be delivered to "each party." It was held from the nature of the acts to be performed and the language of the instrument that there was no agreement the terms of which were ascertained during the lives of the parties, or which would bind those who were entitled after their deaths, and that the effect of the use of the words "heirs," etc., was merely to bind those persons to carry out the agreement after the deaths of the parties in case the agreement should be completed prior thereto by the delivery of the award. See *Dickinson v. Calahan's Admrs.*, 19 Pa. St. 227.

The decree appealed from is reversed and the bill dismissed.

*Kinney, Ballou & McClanahan* for the plaintiff.

*Magoon & Silliman* for the defendant.